RECORD NO. 14-1195

In The

# United States Court of Appeals
## For The Fourth Circuit

## OTERIA Q. MOSES,

*Plaintiff – Appellee,*

**v.**

## CASHCALL, INC.,

*Defendant – Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT GREENVILLE

———————

### REPLY BRIEF OF APPELLANT

———————

Hayden J. Silver, III
Raymond M. Bennett
Jesse A. Schaefer
WOMBLE CARLYLE
  SANDRIDGE & RICE, LLP
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601
(919) 755-2188

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

SUMMARY OF ARGUMENT ...........................................................1

ARGUMENT .................................................................................4

    I.    THE DE NOVO STANDARD OF REVIEW APPLIES ......................4

    II.   THERE IS NO INHERENT CONFLICT BETWEEN ARBITRATION OF THIS ADVERSARY PROCEEDING AND THE UNDERLYING PURPOSES OF THE BANKRUPTCY CODE ....................................................................6

        A.    The implied repeal doctrine requires the "underlying purposes" of the Bankruptcy Code to be construed as narrowly as possible ...............................................8

        B.    The purposes of the Bankruptcy Code are twofold: a fresh start for the debtor and fair distribution to the creditors ................................................................10

            1.    Arbitration will not frustrate the Debtor's fresh start.............................................................11

            2.    Arbitration will not frustrate the creditor distribution ................................................12

        C.    Centralization is not an underlying purpose of the Bankruptcy Code................................................15

        D.    Efficiency concerns are not a valid basis for ignoring the FAA in this case .......................................20

    III.  THE CORE/NON-CORE DISTINCTION IS A LOGICAL OUTGROWTH OF *MCMAHON* AND THE IMPLIED REPEAL DOCTRINE..................................................22

i

IV.    DEBTOR OFFERS MISINFORMATION TO DIVERT ATTENTION FROM THE ISSUES ON APPEAL ............................23

    A.    CashCall is entitled to the protection of the law ......................24

    B.    The North Carolina Debt Collection Act claim is not "inextricably intertwined" with any of Debtor's other claims ...................................................................................25

    C.    Arbitration of Debtor's claims is not a "legal black hole" .......27

CONCLUSION .....................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.H. Robins Co. v. Piccinin*,
      788 F.2d 994 (4th Cir. 1986) ......................................................... 18

*Branch v. Smith*,
      538 U.S. 254 (2003) ...................................................................... 9

*Brown v. Trans World Airlines*,
      127 F.3d 337 (4th Cir. 1997) ......................................................... 24

*Brown v. Western Sky*,
      13-CV-00255-WO-JLW (M.D.N.C. Feb. 10, 2014) ..................................... 24

*Cook Cnty., Ill. v. U.S. ex rel. Chandler*,
      538 U.S. 119 (2003) ...................................................................... 8

*Dean Witter Reynolds, Inc. v. Byrd*,
      470 U.S. 213 (1985) ...................................................................... 21

*Dorsey v. United States*,
      32 S. Ct. 2321 (2012) ................................................................... 8

*Executive Benefits Ins. Agency v. Arkison*,
      134 S. Ct. 2165, 2014 WL 2560461 (2014) ...................................... 23

*Fidelity Mortg. Investors v. Camelia Builders, Inc.*,
      550 F.2d 47 (2d Cir. 1976) ............................................................. 18

*Gilmer v. Interstate/Johnson Lane Corp.*,
      895 F.2d 195 (4th Cir. 1990), *aff'd*,
      500 U.S. 20 (1991) ........................................................................ 19

*Granfinanciera, S.A. v. Nordberg*,
      492 U.S. 33 (1989) ........................................................................ 12

*Grogan v. Garner*,
    498 U.S. 279 (1991)......................................................................10

*Hays & Co. v. Merrill Lynch*, *Pierce*, *Fenner & Smith*, *Inc.*,
    885 F.2d 1149 (3d Cir. 1989)...............................................*passim*

*Heldt v. Payday Fin.*, *LLC*,
    CIV 13-3023-RAL,
    2014 WL 1330924 (D.S.D. Mar. 31, 2014)...........................28, 29

*In re Adell*,
    296 F. App'x 837 (11th Cir. 2008)....................................................6

*In re Barker*,
    510 B.R. 771 (Bankr. W.D.N.C. 2014).........................................17

*In re Crysen/Montenay Energy Co.*,
    226 F.3d 160 (2d Cir. 2000)....................................................16, 17

*In re D & B Swine Farms*, *Inc.*,
    9-02813-8-JRL,
    2011 WL 6013218 (Bankr. E.D.N.C. Dec. 2, 2011).............. 17-18

*In re Elec. Mach. Enterprises*, *Inc.*,
    479 F.3d 791 (11th Cir. 2007).........................................................5

*In re Fries*,
    06-11424PM,
    2007 WL 1073868 (Bankr. D. Md. Jan. 17, 2007).......................12

*In re Gandy*,
    299 F.3d 489 (5th Cir. 2002).........................................................16

*In re Gurga*,
    176 B.R. 196 (B.A.P. 9th Cir. 1994)..............................................17

*In re JKJ Chevrolet*, *Inc.*,
    26 F.3d 481 (4th Cir. 1994)...........................................................10

*In re Mintze*,
     434 F.3d 222 (3d Cir. 2006)................................................................5, 11, 14

*In re Nat'l Gypsum*,
     118 F.3d 1056 (5th Cir. 1997)...........................................................16, 21, 22

*In re Patel*,
     565 F.3d 963 (6th Cir. 2009)...........................................................................10

*In re Puffer*,
     674 F.3d 78 (1st Cir. 2012) ............................................................................10

*In re Seminole Oil & Gas Corp.*,
     963 F.2d 368 (4th Cir. 1992)...........................................................................10

*In re Thorpe Insulation Co.*,
     671 F.3d 1011 (9th Cir. 2012) *cert. denied*,
     133 S. Ct. 119, 184 L. Ed. 2d 26 (2012).........................................5, 16, 21, 22

*In re TP*, *Inc.*,
     479 B.R. 373 (Bankr. E.D.N.C. 2012)............................................................17

*In re White Mountain Mining Co., LLC*,
     403 F.3d 164 (4th Cir. 2005)...................................................................*passim*

*Inetianbor v. CashCall, Inc.*,
     962 F. Supp. 2d 1303 (S.D. Fla. 2013) ................................................3, 15, 28

*KPMG LLC v. Cocchi*,
     132 S. Ct. 23, 181 L. Ed. 2d 323 (2011).........................................................21

*Law v. Siegel*,
     134 S. Ct. 1188, 188 L. Ed. 2d 146 (2014).......................................................7

*Leaf Tobacco Exporters Ass'n*, *Inc. v. Block*,
     749 F.2d 1106 (4th Cir. 1984)........................................................................10

*Marrama v. Citizens Bank of Mass.*,
     549 U.S. 365 (2007)........................................................................................11

*Matter of Nat'l Gypsum Co.*,
118 F.3d 1056 (5th Cir. 1997) ......................................................................5

*Morton v. Mancari*,
417 U.S. 535 (1974) ......................................................................................8

*Musso v. Ostashko*,
468 F.3d 99 (2d Cir. 2006) .........................................................................10

*Posadas v. Nat'l City Bank of New York*,
296 U.S. 497 (1936) ......................................................................................9

*Safety-Kleen, Inc. (Pinewood) v. Wyche*,
274 F.3d 846 (4th Cir. 2001) .....................................................................18

*Santoro v. Accenture Federal Services, LLC*,
12-2561 (4th Cir. 2014) ..............................................................................20

*Scherk v. Alberto-Culver Co.*,
417 U.S. 506 (1974) ....................................................................................21

*Seney v. Rent-A-Ctr. Inc.*,
738 F.3d 631 (4th Cir. 2013) .....................................................................19

*Shearson/Am. Exp., Inc. v. McMahon*,
482 U.S. 220 (1987) .............................................................................*passim*

*Silver v. New York Stock Exch.*,
373 U.S. 341 (1963) ...............................................................................10, 19

*Snyder v. Phelps*,
580 F.3d 206 (4th Cir. 2009) *aff'd*,
131 S. Ct. 1207 (2011) .................................................................................7

*State of Ga. v. Pennsylvania R. Co.*,
324 U.S. 439 (1945) ....................................................................................10

*Stern v. Marshall*,
131 S. Ct. 2594 (2011) ................................................................................12

*Summer Rain v. Donning Co./Publishers Inc.*,
     964 F.2d 1455 (4th Cir. 1992)................................................................21, 26

*Tennessee Valley Auth. v. Hill*,
     437 U.S. 153 (1978)................................................................................ 9-10

*Traynor v. Turnage*,
     485 U.S. 535 (1988)....................................................................................19

*United States v. Aguilar*,
     515 U.S. 593 (1995)......................................................................................9

**STATUTES**

9 U.S.C. § 3 .......................................................................................................20

28 U.S.C. § 1334(c) ..........................................................................................18

28 U.S.C. § 157(b)(5)........................................................................................18

N.C. Gen. Stat. § 75-50(2) ...............................................................................26

N.C. Gen. Stat. §§ 75-51 *et seq.*......................................................................26

**OTHER AUTHORITIES**

5 Collier on Bankruptcy 541.01 (15th ed. Rev. 2005)....................................10

PL 95-598, November 6, 1978, 92 Stat 2549...................................................19

Polina Keshelev, *An International Approach to Breaking the Core of the Bankruptcy Code and FAA Conflict*, 28 Emory Bankr. Dev. J. 355 (2012)............10

Scalia & Garner, READING LAW 250 .................................................................9

Theodore Sedgwick, A TREATISE ON THE RULES WHICH GOVERN THE INTERPRETATION AND APPLICATION OF STATUTORY AND CONSTITUTIONAL LAW 123-24 (New York, John S. Voorhies 1857) .................................................9

# SUMMARY OF ARGUMENT

Asserting factual contentions and legal issues not before the Court—and never considered by the courts below—Debtor attempts to divert attention from the only legal question presented here: whether Congress intended for the Bankruptcy Code (Code) to override the Federal Arbitration Act (FAA) in circumstances like those presented here. And on that critical question, Debtor puts forward a position so extreme that were this Court to adopt it, this Circuit would stand alone in enabling bankruptcy judges freely to ignore the FAA.

Debtor concedes that the Supreme Court's application of the implied repeal doctrine in *Shearson/Am. Exp.*, *Inc. v. McMahon*, 482 U.S. 220, 227 (1987) governs here—and she concedes two out of three steps of the analysis. Debtor concedes that (1) neither the text of the Code (2) nor its legislative history reveals congressional intent to repeal the FAA or to "preclude arbitration in the bankruptcy setting." Appellee's Br. at 13. Therefore, the only question on appeal is whether there is genuinely "an inherent conflict between arbitration [of Debtor's claims] and the underlying purposes of the bankruptcy laws," *id.*, or whether it is possible to proceed with the bankruptcy and still enforce the FAA.

Because arbitration in the circumstances presented will not and has not interfered with Debtor's bankruptcy (where unsecured creditors will receive nothing under the plan, the defendant-creditor has ***released*** Debtor from her loan,

and Debtor's only affirmative claim against the defendant-creditor is one for money damages that does not stem from the bankruptcy), Debtor adopts the extreme position that there is *always* an inherent conflict between arbitration and the underlying purposes of the bankruptcy laws.  *Id.*  Therefore, according to Debtor, it should *always* be left to a bankruptcy judge's discretion whether to enforce an arbitration agreement in bankruptcy.  Such an audaciously sweeping approach would render the FAA a dead letter in bankruptcy—a position that has been rejected by every appellate court to consider the issue.

In rationalizing the Bankruptcy Court's refusal to enforce the FAA, Debtor attempts to manufacture an "inherent conflict" under *McMahon* by identifying new and expansive "underlying purposes" of the Code.  But *McMahon* is not an invitation to define the purposes of the Code as broadly as possible.  Quite the contrary.  Under *McMahon*, the extent to which the Code displaces the FAA is guided by the familiar and time-honored canon of implied repeal, which requires all statutory conflicts to be construed as narrowly as possible.  Thus the Bankruptcy Court was required to apply the FAA (*i.e.*, the earlier statute) to the fullest extent possible—stopping short only if application would render the Code (*i.e.*, the later statute) meaningless.  Debtor has not shown that compliance with the FAA would frustrate the Code so deeply, particularly on the facts actually presented here.

Perhaps for this reason, Debtor takes a number of liberties with the facts. As discussed in greater detail *infra* in Section IV:

- Debtor injects numerous unsubstantiated factual accusations about CashCall that are not before the Court, were not considered by the courts below, and have no bearing on the issues to be decided here— and to which CashCall and others have responded in detail when properly alleged;

- Debtor repeatedly seeks to inject new facts not found in the record from ***other cases***, and in doing so, relies on cases interpreting ***entirely different arbitration clauses***, s*ee*, *e.g.*, *Inetianbor v. CashCall*, *Inc.*, 962 F. Supp. 2d 1303, 1305 (S.D. Fla. 2013);

- Debtor entirely ignores that CashCall has released her from her loan;

- Debtor repeatedly states incorrectly that the bankruptcy court denied CashCall's request to compel "tribal arbitration" of her claims, ignoring the fact that ***her*** arbitration clause specifically allows her to select what she recognizes to be "legitimate arbitration forums" (e.g., AAA and JAMS) to resolve the dispute, for free, within thirty miles of her home.

Debtor's assertion that she will be compelled to arbitrate her claims in a nonexistent forum is false. The lower courts specifically declined to address these claims and made no findings of fact concerning them. In fact, arbitration would almost certainly be complete by now if, instead of procedural posturing, Debtor had devoted her efforts to the quick and easy consumer dispute resolution process to which she agreed.

With all these diversions, Debtor seeks to distract the Court from the real issue: that Debtor's claims may be arbitrated while still giving effect to the

underlying purposes of the bankruptcy laws.  Therefore, there is no inherent conflict between the FAA and the Code in this case, and *McMahon* requires the lower courts to enforce the FAA.

## ARGUMENT

## I.     THE DE NOVO STANDARD OF REVIEW APPLIES

Debtor confuses and blurs the standard of review.  She concedes "the initial question of whether the bankruptcy court has discretion [to ignore the FAA] is a legal one[.]" Appellee's Br. 26 n.2; *see also Hays & Co. v. Merrill Lynch*, *Pierce*, *Fenner & Smith*, *Inc.*, 885 F.2d 1149, 1157 n.10 (3d Cir. 1989).  She nevertheless suggests this legal determination is not subject to *de novo* review.  Appellee's Br. 26.  In doing so, she seriously misreads *White Mountain*.  403 F.3d 164, 168 (4th Cir. 2005) ("We review de novo the conclusions of law reached by the district and bankruptcy courts and we review the bankruptcy court's findings of fact for clear error.").

Contrary to Debtor's loose characterization, the *White Mountain* panel did not "assess[ ] whether the bankruptcy court's *exercise of discretion* was clearly erroneous," Appellee's Br. 27 n.2 (emphasis added), but, rather, whether the bankruptcy court's *findings of fact* were.  *White Mountain*, 403 F.3d at 170.  The Court then examined—de novo—whether the factual record supported the *legal* conclusion that Congress did not intend for the FAA to apply.  *Id.*

4

This is the only permissible approach. Unless the FAA's command to compel arbitration has been implicitly overruled by Congress, the courts have no choice but to compel arbitration. *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1021 (9th Cir. 2012) ("[A] bankruptcy court has discretion to decline to enforce an otherwise applicable arbitration provision only if arbitration would conflict with the underlying purposes of the Code."); *In re Elec. Mach. Enterprises*, *Inc.*, 479 F.3d 791, 799 (11th Cir. 2007) (accord); *In re Mintze*, 434 F.3d 222, 231 (3d Cir. 2006) (accord); *Matter of Nat'l Gypsum Co*., 118 F.3d 1056, 1067 (5th Cir. 1997) (accord); *Hays*, 885 F.2d at 1156 (accord). The extent to which Congress intended the Code to limit the FAA is a quintessential legal question that must be reviewed de novo.

Even if the Debtor's flawed reading of the *White Mountain* standard of review were accurate, however, the Bankruptcy Court's order would be "clearly erroneous." In *White Mountain*, the conclusion that arbitration would "substantially interfere with [debtor's] efforts to reorganize" was grounded in a battery of factual findings.[1] In particular, the court found that resolution of the

---

[1] Specifically, the bankruptcy court in *White Mountain* found that arbitration would "make it difficult for the debtor to attract additional funding," "undermine creditor confidence in debtor's ability to reorganize," "undermine the confidence of other parties doing business with the debtor," "impose additional costs on the estate and divert the attention and time of the [debtor]," and cost more than the adversary proceeding. 403 F.3d at 170.

adversary proceeding was "critical to the debtor's ability to formulate a plan of reorganization." *White Mountain*, 403 F.3d at 167, 170. Here, by contrast, the Bankruptcy Court did not make *any* findings to support the conclusion that arbitration would substantially interfere with Debtor's efforts to reorganize. JA 81–89. Indeed, the court did not conduct an evidentiary hearing, and made no factual findings at all. *Id.* Instead, the Bankruptcy Court off-handedly refused to compel arbitration without considering whether arbitration might inherently conflict with the Code. JA 87, 88. Even if the Bankruptcy Court had discretion to decide such a fundamental question of law, reversal is necessary because the court did not properly exercise any discretion it did have. *See Hays*, 885 F.2d at 1155; *see also In re Adell*, 296 F. App'x 837, 839 (11th Cir. 2008).

## II.  THERE IS NO INHERENT CONFLICT BETWEEN ARBITRATION OF THIS ADVERSARY PROCEEDING AND THE UNDERLYING PURPOSES OF THE BANKRUPTCY CODE.

Because the Debtor concedes that neither the Code's text nor its legislative history demonstrate congressional intent to limit the FAA, the *only* issue before this Court under the *McMahon* analysis is "whether there is an inherent conflict

6

between arbitration [of Debtor's claims] and the underlying purposes of the bankruptcy laws." Appellee's Br. 13.[2]

The parties arrive at sharply divergent answers to this question because they frame the underlying purposes of the Code so differently. *Compare* Appellee's Br. 48 (adopting broadest possible reading such that *every* arbitration poses an inherent conflict with bankruptcy), *with* Appellant's Br. 48 (reading the underlying purposes narrowly, as required by *McMahon*). *McMahon* incorporates the implied repeal doctrine, which requires courts to resolve any conflict between the FAA and the Code by narrowly construing the conflict. Accordingly, the Court must adopt the narrowest reasonable reading of the Code's underlying purposes, which are twofold: a fresh start for debtor and a fair distribution to the creditors. In this case, none of Debtor's claims implicate either fundamental purpose. Undaunted, Debtor attempts to identify centralization and efficiency as standalone purposes of the Code. But this attempt fails because it would mean that the FAA would never

---

[2] Debtor's amici appear reluctant to make the same concessions. *See*, *e.g.*, Br. NACTT 16 (arguing the text of the Code evinces congressional intent to override the FAA for core claims); Br. NACBA 24 (implying bankruptcy court may have extra-statutory equitable powers to hear this case to prevent "systematic abuse."). Amici's arguments are not before the Court and thus do not warrant a response. *Snyder v. Phelps*, 580 F.3d 206, 216 (4th Cir. 2009) *aff'd*, 131 S. Ct. 1207 (2011). Suffice it to say, however, the text of the Code does not expressly preclude arbitration of core claims, *see* Appellant's Br. 43–45, and, "in exercising [its] statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions" such as the FAA. *See Law v. Siegel*, 134 S. Ct. 1188, 1194, 188 L. Ed. 2d 146 (2014).

apply in bankruptcy—a position that no court has ever taken.  Moreover, in arguing that efficiency concerns, standing alone, justify discarding the FAA, Debtor ignores a slew of caselaw to the contrary.

### A. The implied repeal doctrine requires the "underlying purposes" of the Bankruptcy Code to be construed as narrowly as possible.

The Code displaces the FAA only in those narrow circumstances in which the two statutes irreconcilably conflict.  In determining the "underlying purposes" of the Code under *McMahon*'s articulation of implied repeal, the Court's goal is to *reconcile* the FAA and the Code, not to pit them against each other.

Congress may silently modify or repeal an existing statute by enacting a new one. *Dorsey v. United States*, 132 S. Ct. 2321, 2331 (2012).  The problem for the courts is that "[i]nferring repeal [of an earlier statute] from legislative silence is hazardous at best, and error seems overwhelmingly likely in the notion that [the later statute] wordlessly" modified the earlier statute.  *Cook Cnty.*, *Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 132 (2003).  By preventing inadvertent judicial overreach, the implied repeal doctrine preserves the primacy of the elected decision-makers in our democratic system.  *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.")  "The cardinal rule is that repeals by implication are not favored.

Where there are two acts upon the same subject, effect should be given to both if possible …. [T]he later act is to be construed as a continuation of, and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of the first enactment." *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936). The rationale behind the rule is simple:

> [L]aws are presumed to be passed with deliberation, and with full knowledge of all existing ones on the same subject; … [presumably,] the legislature, in passing a statute, did not intend to interfere with or abrogate any prior law relating to the same matter, unless the repugnancy between the two is irreconcilable[.]

Theodore Sedgwick, A TREATISE ON THE RULES WHICH GOVERN THE INTERPRETATION AND APPLICATION OF STATUTORY AND CONSTITUTIONAL LAW 123-24 (New York, John S. Voorhies 1857); *see also* Scalia & Garner, READING LAW 250 (noting that, though the "legislative omniscience" assumed by the rule may be "fanciful," it is necessary for a clear and predictable code of laws).

Mere overlap between an earlier and later statute "hardly leads to the conclusion that [the earlier statute] was, to the extent of the overlap, silently repealed." *See*, *e.g.*, *United States v. Aguilar*, 515 U.S. 593, 616 (1995). To the contrary, "implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (internal quotation marks omitted); *see also*, *e.g.*, *Tennessee Valley*

*Auth. v. Hill*, 437 U.S. 153, 190 (1978); *State of Ga. v. Pennsylvania R. Co.*, 324 U.S. 439, 457 (1945).

Thus, Debtor is wrong to contrive a conflict by reading the purposes of the Code as broadly as possible. Appellee's Br. 27. The FAA should be pared back "only if necessary to make the [Code] work, and even then only to the minimum extent necessary." *See Silver v. New York Stock Exch.*, 373 U.S. 341, 357 (1963). When viewed in context, *McMahon* requires the narrowest reasonable reading of the Code's purposes. *Leaf Tobacco Exporters Ass'n*, *Inc. v. Block*, 749 F.2d 1106, 1115 (4th Cir. 1984) ("[S]tatutes should be read, if possible, as harmonious texts.")

**B.    *The purposes of the Bankruptcy Code are twofold: a fresh start for the debtor and fair distribution to the creditors.***

The federal courts have overwhelmingly identified two purposes that animate the Code: (1) a fresh start for the debtor and (2) fair and equal distribution among her creditors. *Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006) (citing 5 Collier on Bankruptcy 541.01 (15th ed. Rev. 2005)); *In re Patel*, 565 F.3d 963, 967 (6th Cir. 2009); *In re Puffer*, 674 F.3d 78, 85 (1st Cir. 2012) (Lipez, J., concurring); Polina Keshelev, *An International Approach to Breaking the Core of the Bankruptcy Code and FAA Conflict*, 28 Emory Bankr. Dev. J. 355, 360 (2012); *see*, *e.g.*, *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *In re Seminole Oil & Gas Corp.*, 963 F.2d 368 (4th Cir. 1992); *In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 484 (4th Cir. 1994).

10

And there is no dispute that the *principal* purpose of the Code is the debtor's fresh start. Appellee's Br. 4 (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007). The creditors' interest is secondary. *See Mintze*, 434 F.3d at 231. When considered in light of these commonly identified purposes of the Bankruptcy Code, it is clear there is no inherent conflict between arbitration in this case and the underlying purposes of the Code.

### 1. *Arbitration will not frustrate the Debtor's fresh start*

In some instances, arbitration of a ***core*** claim will present an inherent conflict with the underlying purposes of the Bankruptcy Code because arbitration will frustrate the Debtor's ability to reorganize. In *White Mountain*, for example, arbitration of a core claim would have endangered the debtor's fresh start by delaying confirmation of the debtor's plan—and, necessarily, debtor's discharge. *See* Appellant's Br. 47. Confirmation of the *White Mountain* plan would have been "contingent on an arbitrator's ruling rather than the ruling of the bankruptcy judge assigned to hear the debtor's case." *See White Mountain*, 403 F.3d at 169. For this reason, arbitration would have "substantially interfered with the debtor's efforts to reorganize." *See id.* at 170. In short, arbitration in *White Mountain* stood between the debtor and its fresh start.

The same cannot be said in this case. Debtor's plan is confirmed and arbitration of her adversary proceeding will not delay her discharge or change the

11

amount of her plan payments. Debtor will emerge from bankruptcy to enjoy her fresh start regardless of who ultimately decides her claims. *See*, *e.g*, *In re Fries*, 06-11424PM, 2007 WL 1073868 (Bankr. D. Md. Jan. 17, 2007) (compelling similar adversary proceeding to arbitration). Indeed, the only claims having anything to do with Debtor's bankruptcy (*i.e.*, the objection to the proof of claim and declaratory judgment action) are moot because CashCall has released Debtor from her obligations under the Agreement.

### 2. *Arbitration will not frustrate the creditor distribution*

None of Debtor's claims will have any impact on her creditors. There can be no dispute that Debtor's non-core claim seeking statutory damages and damages for emotional distress for alleged collections abuses under the NCDCA will not impact the distribution of her assets among her creditors. By definition, non-core claims do not implicate any creditor's "claim to a pro rata share of the bankruptcy res." *Stern v. Marshall*, 131 S. Ct. 2594, 2614, 2618 (2011) (citing *Granfinanciera*, *S.A. v. Nordberg*, 492 U.S. 33, 35 (1989)).

Arbitration of Debtor's core claims challenging the validity of her loan also will not have any practical effect on the creditors in this case because CashCall has affirmatively released Debtor from her loan, JA 5—not for the purpose of gamesmanship, as Debtor suggests, Appellee's Br. 17 n.1, but simply because it does not make financial sense to litigate a proof of claim for less than $2,000 in

bankruptcy when the gravamen of the Debtor's claim—which must be resolved in arbitration—is a non-core claim for damages many times that amount (including emotional distress damages) for alleged collections abuse under the NCDCA. JA 38–40. Because CashCall has released the loan, any decision on CashCall's proof of claim is moot as a **_constitutional matter_**, even if the bankruptcy court has refused to exercise its discretion to allow CashCall to withdraw its proof of claim for now.[3]

Moreover, even if Debtor's core claims were not moot, they are entirely irrelevant. As it stands now, unsecured creditors will receive absolutely nothing under Debtor's plan. Even if Debtor is successful in invalidating her agreement with CashCall, the distribution to the other general unsecured creditors is expected to be zero.

Debtor and her amici attempt to get around this fact by arguing that Debtor's circumstances might change. Her unsecured creditors might someday receive a dividend, Debtor hypothesizes, _if_ she gets a higher-paying job _and_ the trustee or an unsecured claimholder petitions for a modification of her plan _and_ the Bankruptcy Court approves the modification. Appellee's Br. 35-36. CashCall concedes that if it had not already released Debtor's loan, and if this fortuitous series of events

---

[3] CashCall has not abandoned the proof of claim issue on appeal as Debtor suggests. Appellee's Br. 17–18 n.1. It simply cannot appeal that issue yet. JA 118–21 (denying leave to file an interlocutory appeal on this issue).

were to occur, the Bankruptcy Court could be faced with the question whether distribution to creditors is so fundamental to the Code that it should trump the FAA.

But even that question is far from settled. The court in *White Mountain* had no occasion to consider whether arbitration affecting the bankruptcy's secondary purpose (*i.e.*, creditor distribution) would inherently conflict with the Code. But the Third Circuit has addressed this issue. In *In re Mintze*, the lower court found that arbitration of the adversary proceeding would not impede or delay the debtor's fresh start, but that the Code nevertheless overrode the FAA because "the ultimate decision on [debtor's claim] will have an effect on the rights of the other creditors." 434 F.3d at 231. The Third Circuit reversed, holding that when the debtor herself attempts to enforce claims in an adversary proceeding, "we perceive no adverse effect on the underlying purposes of the Code from enforcing arbitration—certainly no adverse effect of sufficient magnitude to relieve a … court of its mandatory duty under the Arbitration Act." *Id.* at 232 (quoting *Hays*, 885 F.2d at 1161). In this way, the Third Circuit necessarily concluded that timely creditor distribution was not such a fundamental purpose of the Code that it trumped the FAA.

In sum, arbitration of Debtor's core claim may conflict with the Code only if CashCall's release is ignored, Debtor receives a windfall, her Chapter 13 Plan is

modified, and this Court pointedly rejects the Third Circuit's analysis. While it may be *theoretically* possible for arbitration of Debtor's core claims to *someday* inherently conflict with the Code, that day is not today.[4]

The FAA requires arbitration of Debtor's adversary proceeding unless she can *show*—not merely hypothesize—that arbitration of any one of her claims would inherently conflict with the narrowest reasonable reading of the Code's purposes. *See McMahon*, 482 U.S. at 227. In this, Debtor has failed. Because arbitration in this case would not frustrate any of the central goals of bankruptcy, Debtor has no real argument that the FAA has been impliedly repealed. *McMahon* directs that the FAA must be applied, and the FAA unambiguously requires arbitration.

### C.    *Centralization is not an underlying purpose of the Bankruptcy Code.*

Debtor attempts to evade this conclusion by elevating bankruptcy's *procedural* approach—*i.e.*, centralization—to the status of an "underlying purpose" of the Code. Appellee's Br. 5, 27, 48. In advancing this argument, Debtor and her amici turn the canon of implied repeal on its head, *maximizing* potential conflict between the statutes instead of *minimizing* it.

---

[4] Even if this very unlikely situation ever arose, the courts have shown they know what to do. *See Inetianbor*, 962 F. Supp. 2d at 1306 (enjoining arbitration after first compelling it).

While it is true that the Code generally "centraliz[es] disputes about a debtor's assets and legal obligations in the bankruptcy courts," *White Mountain*, 403 F.3d at 169, at least initially, this centralization is merely a means to an end—the "efficient[]" "reorganization" of the Debtor's estate (*i.e.*, the debtor's fresh start). *Id.* And as discussed in greater detail below, initial centralization is often followed by decentralization of some disputes in accordance with decision-rules established by Congress in the Code. Thus centralization—for its own sake—cannot be an "underlying purpose" of the Code.

Debtor grossly overreads this Court's references to centralization in *White Mountain*, leading to extreme conclusions far afield from other appellate courts addressing the intersection between the FAA and the Bankruptcy Code.[5] If centralized resolution of all claims were a standalone "underlying purpose" of the Code, it would logically follow that arbitration in bankruptcy would *always* fail *McMahon*'s third prong. After all, arbitration is always inconsistent with centralized decision-making. *White Mountain*, 403 F.3d at 169. But this position

---

[5] *See*, *e.g.*, *In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002) (the FAA leaves "a bankruptcy court [with] no discretion to refuse to compel arbitration" of non-core claims); *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 166 (2d Cir. 2000) (it has been "generally accepted" that, under the FAA, "district courts *must* stay non-core proceedings in favor of arbitration" (emphasis in original)); *Nat'l Gypsum*, 118 F.3d at 1066 (centralization concerns can override the FAA only if decentralization would "present a genuine conflict between the [FAA] and the Code" by hindering the debtor's fresh start or the rights of the creditors); *Thorpe*, 671 F.3d at 1101 (accord).

16

is not even compatible with the "general rule" as Debtor sees it: "[T]ypically, arbitrating statutorily core claims will inherently conflict with bankruptcy *while arbitration of non-core claims will not*."  Appellee's Br. 31–32 (emphasis added).

If Debtor were right about centralization, arbitration of *any* bankruptcy claim (including non-core claims) would *always* present an inherent conflict, and thus bankruptcy courts would *never* have to comply with the FAA.  In Debtor's view, apparently, the courts have been working way too hard trying to parse arbitrable and non-arbitrable claims.  *See*, *e.g.*, *Crysen/Montenay*, 226 F.3d at 166 ("The presumption in favor of arbitration generally will trump the lesser interest of bankruptcy courts in adjudicating non-core proceedings that could otherwise be arbitrated."); *In re Gurga*, 176 B.R. 196, 197 (B.A.P. 9th Cir. 1994) (reversing lower court because the FAA requires "a bankruptcy court to enforce an agreement to arbitrate a claim that is noncore."); *In re Barker*, 510 B.R. 771, 780 (Bankr. W.D.N.C. 2014) (holding that non-core claims must be arbitrated and core claims that do not inherently conflict with the Code must also be arbitrated); *In re TP*, *Inc.*, 479 B.R. 373, 382 (Bankr. E.D.N.C. 2012) ("In light of the dichotomy between bankruptcy and arbitration policy, the court must evaluate each cause of action in the present adversary proceeding to determine whether it is a core proceeding."); *In re D & B Swine Farms*, *Inc.*, 09-02813-8-JRL, 2011 WL 6013218

(Bankr. E.D.N.C. Dec. 2, 2011) (compelling arbitration of all arbitrable non-core claims and retaining all core claims and non-arbitrable non-core claims).

In fact, the Code often works through decentralized means—as is readily apparent from the cases Debtor cites. *See Fidelity Mortg. Investors v. Camelia Builders*, *Inc.*, 550 F.2d 47, 55 (2d Cir. 1976) (the automatic stay "insures that a debtor's affairs will be centralized, *initially*, in a single forum in order to prevent conflicting judgments from different courts and in order harmonize the creditors' interests with one another." (emphasis added)). The automatic stay stops the "chaotic and uncontrolled scramble for debtor's assets" by pausing all ongoing collection efforts and bringing all disputes under one roof. *Safety-Kleen*, *Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 864 (4th Cir. 2001). But *after* the automatic stay has quieted the frenzy, the Code contemplates that the courts may (and in some cases, must) direct bankruptcy claims to other forums for adjudication. *See* 28 U.S.C. § 157(b)(5) (bankruptcy courts may not hear personal injury or wrongful death matters); 28 U.S.C. § 1334(c) (state courts must hear bankruptcy-related claims if the federal courts would not have jurisdiction outside of bankruptcy and the state proceeding "can be timely adjudicated."); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011 (4th Cir. 1986) (district court may designate venue for personal injury or wrongful death claims relevant in bankruptcy).

These provisions belie Debtor's position that Congress wanted every bankruptcy-related claim invariably to be decided by a bankruptcy court. *Hays*, 885 F.2d at 1157 n.11. Debtor offers no reason why *these* congressional commands to decentralize adjudication should have effect in bankruptcy but the similar command in the FAA should not. Nor can Debtor show that decentralization, in the abstract, would make the Code "not work" or "have no meaning at all." *See Silver*, 373 U.S. at 357; *Traynor v. Turnage*, 485 U.S. 535, 548 (1988).[6]

If Congress had intended the Code to be so pointedly contrary to the FAA, it could certainly have said so. In fact, Congress carefully amended 40 *other* statutes when it enacted the Code in 1978—but chose to leave the FAA untouched. *See* PL 95-598, November 6, 1978, 92 Stat 2549. Because the Code says nothing about the FAA or arbitration, the courts must presume the FAA applies. *See Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195 (4th Cir. 1990), *aff'd*, 500 U.S. 20 (1991); *Seney v. Rent-A-Ctr. Inc.*, 738 F.3d 631, 635 (4th Cir. 2013).

---

[6] It is quite likely that Congress intended the Code and the FAA to be complementary. The automatic stay funnels all arbitrable disputes to the bankruptcy court to determine whether arbitration of the dispute would irreconcilably conflict with the Code's underlying purposes. If not, the FAA requires arbitration under the Bankruptcy Court's supervision.

### D.   Efficiency concerns are not a valid basis for ignoring the FAA in this case.

Debtor attempts to swamp the FAA by framing the *raison d'etre* of the Code as the very antithesis of arbitration. Appellee's Br. 40, 51. This is the only way she can even *try* to harmonize the lower courts' decisions with *McMahon*. The lower courts themselves never engaged in a *McMahon* analysis at all.

Despite Debtor's lonely efforts to manufacture an inherent conflict now, the conflict between the two statutes is largely imagined. The language of the FAA *expressly* speaks to this situation—requiring that all claims subject to an arbitration clause be referred to an arbitrator. 9 U.S.C. § 3. There is no language in the Code that says otherwise. Thus it is possible to obey the express mandate of the FAA without violating a single letter of the Code. *See Santoro v. Accenture Federal Services, LLC*, 12-2561, *5 (4th Cir. 2014) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms").

Still, Debtor and her amici argue that the reach of the FAA should end exactly where the Code begins because the bankruptcy system would just *work better* that way. Appellee's Br. 51; Br. Amicus Curiae Nat'l Assn. Chapter Thirteen Trustees ("NACTT") 4–5. Of course the same also might be said for *every other court in the country*. But the appellate courts routinely reject the very challenges

20

to the FAA that Debtor champions here: concerns about efficiency, fear of inconsistent judgments, avoidance of parallel proceedings, unknown expenses, and the like. *Compare* Appellee's Br. 51, *with Dean Witter Reynolds*, *Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (holding that courts are not at liberty to "substitute their own view of economy and efficiency for those of Congress." (internal quotation marks omitted)), *and KPMG LLC v. Cocchi*, 132 S. Ct. 23, 26, 181 L. Ed. 2d 323 (2011), *and Brown v. Trans World Airlines*, 127 F.3d 337, 342 (4th Cir. 1997), *and Summer Rain v. Donning Co./Publishers Inc.*, 964 F.2d 1455, 1457 (4th Cir. 1992); *see also* Appellant's Br. 36–40. Debtor's argument panders to judicial irritability with arbitration—an attitude that Congress, through the FAA, has been trying to stamp out for the last 90 years. *See*, *e.g.*, *Byrd*, 470 U.S. at 218; *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974).

Debtor tries to dismiss this mountain of binding authority in the arbitration context with a trite incantation: "bankruptcy is different." Appellee's Br. 49 (citing *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1023 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 119, 184 L. Ed. 2d 26; *In re Nat'l Gypsum*, 118 F.3d 1056, 1070 (5th Cir. 1997)). But the Code is a statute like any other. It can impliedly repeal earlier statutes only if they "inherently conflict" with the Code's "underlying purposes." *McMahon*, 482 U.S. at 227. The non-binding authority cited by the Debtor does not hold otherwise. Appellee's Br. 50 ("*[I]nsofar* as efficiency concerns *might*

21

present a genuine conflict between the Federal Arbitration and the [Bankruptcy] Code—*for example where severe delays would prejudice the rights of creditors or the ability of a debtor to organize*—they *may* well represent legitimate considerations." (emphasis added; internal alterations omitted) (quoting *In re Nat'l Gypsum*, 118 F.3d 1056, 1070 (5th Cir. 1997)).  *Thorpe* and *National Gypsum* stand for the uncontested proposition that there is an implied and narrow exception to the FAA where compliance with the FAA's mandate would defeat the Code's purposes (*i.e.*, a debtor's fresh start and, possibly, fair distribution to the creditors)—which is not the case here.  *Thorpe* and *National Gypsum* simply do not support Debtor's aggressive position that centralization is the entire point of bankruptcy.

## III.  THE CORE/NON-CORE DISTINCTION IS A LOGICAL OUTGROWTH OF *MCMAHON* AND THE IMPLIED REPEAL DOCTRINE.

The application of the *McMahon* standard has two practical consequences.  First, all *non-core* claims must be sent to arbitration because, by definition, they cannot possibly conflict with the underlying purposes of the Code.  Appellant's Br.

22

31. Second, every *core* claim that can be arbitrated without frustrating the goals of the Code must go to arbitration as well.  Appellant's Br. 24.[7]

By treating this core/non-core rule of thumb as a dispositive rule, however, the lower courts misperceived the contours of *White Mountain* and lost track of what they actually should have been doing: determining whether Congress intended for the Code to impliedly preclude application of the FAA in this case. Because arbitration of this adversary proceeding will not interfere with Debtor's fresh start—or the other unsecured creditors' distribution—at all, the Code and the FAA can work together just fine.  Because they can, they must.

## IV.  DEBTOR OFFERS MISINFORMATION TO DIVERT ATTENTION FROM THE ISSUES ON APPEAL

As noted in the summary above, Debtor has attempted to inject various misinformation into this appeal, which can be found nowhere in the lower courts' opinions.  Debtor and the amici spend considerable space and effort trying to paint CashCall as a bad actor not worthy of the protection of the law, mischaracterizing

---

[7]  It is important to note that this core/non-core distinction is nothing more than the logical consequence of *McMahon* and the implied repeal doctrine.  It is not codified in the Code.  Thus, Debtor misses the mark yet again when she suggests, in passing, that Congress's statutory definition of core proceedings might sway the analysis. Appellee's Br. 22, 40; Br. NACBA 21–22.  It can not.  After all, Congress has never said that statutorily core claims are exempt from the FAA.  Even if it had, the Supreme Court has unequivocally held that *Stern* claims are to be treated as statutorily non-core.  *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173, 2014 WL 2560461, at *7-*8 (2014).

Debtor's complaint, and claiming—without any evidentiary support—that arbitration of this adversary proceeding would be impossible. None of this is true. Nor is it relevant. But, because Debtor's claims are designed to disorient and distract the Court from the pure question of statutory interpretation actually presented in this appeal, CashCall briefly addresses her misapprehensions here.

## A.    *CashCall is entitled to the protection of the law.*

Debtor and her amici cast aspersions on CashCall, its business model, the validity of its agreements, its tribal partners, its collection practices, etc. Appellee's Br. 1-2, 14-16, 53-56; Br. Amicus Curiae Nat'l. Assn. Consumer Bankr. Attys. ("NACBA") 2-15, 22-24. These claims misrepresent the facts and have no evidentiary support.

In reality, Western Sky, the originator of Debtor's loan, is a wholly Native-American-owned entity operating out of the Cheyenne River Sioux Tribe ("CRST") reservation. *See generally*, *e.g.*, *Brown v. Western Sky*, 13-CV-00255-WO-JLW, DE 92, 94 (addressing in detail many of the accusations Debtor makes here). Until Western Sky ceased operations, it provided many jobs to the impoverished and unemployment-stricken tribe. The CRST has specifically licensed Western Sky to lend under CRST law, which, unlike North Carolina law, does not place caps on consumer loan interest rates. Western Sky consumers like Debtor reached out through the Internet to enter loan agreements on tribal territory,

24

and they knowingly consented to the jurisdiction and laws of the tribe. CashCall simply purchased these negotiable loan agreements from Western Sky after origination.

Debtor's attacks are particularly wearisome in this appeal. The lower courts declined to address these red herrings—no doubt because they do not make a difference to the outcome in this case. Even if CashCall were the boogeyman Debtor makes it out to be, it would not alter Congress's intent when it passed the Code. Just because Debtor thinks poorly of CashCall does not mean that CashCall is not entitled to arbitration of Debtor's claims under the FAA.

### B.    *The North Carolina Debt Collection Act claim is not "inextricably intertwined" with any of Debtor's other claims.*

Debtor and her amici blindly embrace the District Court's finding that the non-core NCDCA claim is "inextricably intertwined" with the core claims because it "exclusively depends on" and will "rise or fall" with their resolution. JA 126, 127. But the *Bankruptcy Court* actually never reached the same conclusion. *See* JA 127 (noting that, simply because the Bankruptcy Court did not comply with the FAA, the court must have "implicitly found" that the non-core NCDCA claim exclusively depended on the core claims). This "implicit finding" was the only way the District Court could reconcile the Bankruptcy Court's errant holding with those of other courts following *McMahon*. JA 127.

Even if the intertwining doctrine were valid,[8] the District Court's holding entirely depends on a misreading of Debtor's complaint. Debtor's complaint alleges violations of the NCDCA wholly independent from the supposed invalidity of her loan agreement. JA 39, at ¶ 32 ("[CashCall] has willfully engaged in *other* and *further* violations of the [NCDCA] as may be shown through discovery and proved at trial." (emphasis added)); *id.* at ¶¶ 8-9 (alleging that CashCall's "telephone calls and duns" caused Debtor emotional distress).

Thus, it is not correct that Debtor's NCDCA claim "exclusively depends" on the resolution of her core claims—this case is not over, as Debtor suggests, as soon as the validity of the loan is resolved. Only part of Debtor's non-core claim rests on her novel argument that *every* collection attempt may result in liability if the underlying loan agreement is someday invalidated.[9] As her amicus freely admits, "if Ms. Moses had alleged that CashCall [engaged in abusive collection practices] …. [t]hat claim would not be solely dependent on the invalidity of the

---

[8] It is not. *Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1457 (4th Cir. 1992). Debtor's only response to *Summer Rain* is to argue that neither the holding (nor the logic) of a non-bankruptcy case should be applied in bankruptcy. Appellee's Br. 46, 49. As discussed fully in Section II(d), *supra*, this argument is simply wrong.

[9] This is also incorrect. The NCDCA prohibits "threats and coercion," "harassment," "deceptive representations," and other abusive collection practices. *See* N.C. Gen. Stat. §§ 75-51 *et seq.* But it clearly *permits* non-abusive collection efforts on disputed loans. N.C. Gen. Stat. § 75-50(2) (defining "debt" to mean any obligation "owed *or alleged to be owed*" (emphasis added)).

underlying debt." Br. NACBA 18-19. That is exactly what Debtor is alleging. This fact-intensive dispute simply has nothing to do with the validity of the loan.

### C.    Arbitration of Debtor's claims is not a "legal black hole"

Debtor alleges that arbitration of her claims would be a "legal black hole" that would prevent her from ever completing her bankruptcy. Apellee's Br. 2, 26. According to Debtor, her arbitration agreement requires her "to litigate … under nonexistent rules, sometimes before nonexistent arbitrators, in a forum that, itself may not actually exist." Appellee's Br. 18, 54-55. This hyperbolic argument was disregarded by the lower courts, and it entirely ignores the language of Debtor's arbitration agreement (which is different from the arbitration agreements discussed in many of the cases Debtor cites).

There are two relevant clauses in Debtor's arbitration agreement. The first, labeled "Agreement to Arbitrate," provides:

> You [*i.e.*, Debtor] agree that any Dispute, **except as provided below**, will be resolved by Arbitration which shall be conducted by the Cheyenne River Sioux Tribal Nation ["CRST"] by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

JA 76 (emphasis added). A more detailed provision, labeled "Choice of Arbitrator" is "provided below":

> Regardless of who demands arbitration, **you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association ["AAA"] …; JAMS …; or an arbitration organization agreed**

> **upon by you and the other parties to the Dispute.** The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate[.]

JA 76 (emphasis added). The arbitration is free to Debtor, and it will be conducted within thirty miles of her home (which, incidentally, is several miles closer than the Bankruptcy Court). *Id.*

Debtor concedes that AAA and JAMS are "legitimate arbitration forums." Appellee's Br. 56 n.8. But she suggests this Court should strike down the arbitration agreement—on appeal, without any findings below—because the two arbitrator-selection clauses are incompatible. *Id.* Debtor entirely overlooks the proviso in the Agreement-to-Arbitrate clause. JA 76. The arbitration agreement, *by its express terms*, favors the arbitration-selection provisions of the Choice-of-Arbitrator clause over those of the Agreement-to-Arbitrate clause. *Id.*

Admittedly, it has not always been this way. In cases that Debtor cites to support the impossibility of arbitration, the courts were interpreting earlier arbitration agreements that did not include the AAA/JAMS proviso. *Inetianbor*, 962 F. Supp. 2d at 1305 (no opportunity to select AAA or JAMS); *Heldt v. Payday Fin.*, *LLC*, CIV 13-3023-RAL, 2014 WL 1330924 (D.S.D. Mar. 31, 2014) (three of

the four agreements did not allow for the selection of AAA or JAMS);[10] *see also* Appellee's Br. 19 (admitting that these agreements were only "similar" to Debtor's, not identical).  But under *Debtor*'s agreement she can avoid "tribal arbitration" simply by electing a different forum.

## CONCLUSION

For the foregoing reasons, CashCall respectfully requests that this Court reverse the District Court and Bankruptcy Court and remand the case with instructions to compel arbitration of the adversary proceeding.

---

[10] Although the fourth agreement in *Heldt* had the AAA/JAMS proviso, the court overlooked it.  As a result, the court misread the arbitration agreement to require an arbitrator who was *both* an authorized representative of CRST *and* a member of AAA or JAMS.  *Heldt*, 2014 WL 1330924, at *19.  Such a reading is both incorrect and unwarranted.

This the 20th day of August, 2014.

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

/s/ Hayden J. Silver III
Hayden J. Silver III (NC State Bar 10037)
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601
Phone: (919) 755-2188
Fax: (919) 755-6099
jsilver@wcsr.com

/s/ Raymond M. Bennett
Raymond M. Bennett (NC State Bar No. 36341)
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601
Phone (919) 755-2158
Fax (919) 755-6068
rbennett@wcsr.com

/s/ Jesse A. Schaefer
Jesse A. Schaefer (NC State Bar No. 44773)
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601
Phone (919) 755-8182
Fax (919) 755-6082
jschaefer@wcsr.com

*Attorneys for Appellant CashCall, Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*6,961*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: August 20, 2014                    /s/ Hayden J. Silver III
                                                         *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 20th day of August, 2014, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Adrian M. Lapas
STRICKLAND, LAPAS, AGNER & ASSOCIATES
112 North William Street
Goldsboro, North Carolina  27530
(919) 735-8888

Leah M. Nicholls
Matthew W. H. Wessler
PUBLIC JUSTICE, PC
1825 K Street, NW, Suite 200
Washington, DC  20006
(202) 797-8600

*Counsel for Appellee*

I further certify that on this 20th day of August, 2014, I caused the required copies of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Hayden J. Silver III
*Counsel for Appellant*