No. 14-1195

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

OTERIA Q. MOSES,

*Plaintiff-Appellee-Petitioner,*

v.

CASHCALL, INC.,

*Defendant-Appellant-Respondent.*

_____

Appeal from the United States District Court for the Eastern District of North Carolina

_____

## PETITION FOR REHEARING AND REHEARING *EN BANC*
_____

Adrian M. Lapas
LAPAS LAW OFFICES, PLLC
642 N. Spence Avenue
Goldsboro, NC 27534
(919) 583-5400

Matthew W. H. Wessler
Leah M. Nicholls
PUBLIC JUSTICE, P.C.
1825 K Street NW, Suite 200
Washington, DC 20006
(202) 797-8600

*Counsel for the Petitioner*

March 30, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION AND RULE 35(b) AND LOCAL
RULE 40(b) STATEMENT ..................................................................1

STATEMENT ........................................................................................4

1. The Bankruptcy Proceedings ...........................................................4

2. The Bankruptcy Court's Decision. ...................................................5

3. The District Court's Decision. ..........................................................6

4. The Panel's (Four) Opinions.............................................................7

    A. The Core Claim .........................................................................7

    B. The Non-Core Claim .................................................................8

*EN BANC* REVIEW IS WARRANTED TO ESTABLISH THE STANDARDS
GOVERNING WHETHER, AND TO WHAT EXTENT, A LOWER COURT
HAS DISCRETION TO KEEP NON-CORE CLAIMS IN BANKRUPTCY........11

CONCLUSION ....................................................................................15

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Arnold v. Eastern Air Lines, Inc.*,
  712 F.2d 899 (4th Cir. 1983) ...............................................................11

*United States v. Vann*,
  660 F.3d 771 (4th Cir. 2011) ..............................................................3

*In re White Mountain Mining Co.*,
  403 F.3d 164 (4th Cir. 2005) ..............................................................2

*Williams v. Illinois*,
  132 S. Ct. 2221 (2012).........................................................................14

## STATUTES

11 U.S.C. § 502(a) ........................................................................................4

N.C. Gen. Stat. §§ 53-164 to -191 ..............................................................4

N.C. Gen. Stat. §§ 75-50 to -56 ..................................................................5

## OTHER AUTHORITIES

Administrative Office of the United States Courts, 2014 Annual
  Report, *available at* http://www.uscourts.gov/Statistics/
  JudicialBusiness/2014/statistical-tables-us-bankrupt-courts.aspx.............. 2-3, 15

American Bar Association, Amicus Br., *EBIA v. Arkison*,
  134 S. Ct. 2165 (2014)...................................................................3, 15

Consumer Financial Protection Bureau, Arbitration Study (2015),
  *available at* http://www.consumerfinance.gov/f/201503_cfpb_
  arbitration-study-report-to-congress-2015.pdf. ...................................................3

## INTRODUCTION AND RULE 35(b) AND LOCAL RULE 40(b) STATEMENT

In this case involving the interplay between two bedrock federal laws—the Bankruptcy Code and the Federal Arbitration Act—a three-judge panel of this Court issued four separate opinions. Each judge on the panel filed his own opinion, and, in an attempt to clarify the actual holding, the panel also issued a *per curiam* opinion. But, amid this sea of opinions, the panel failed to issue a controlling decision on a frequently recurring question of exceptional importance: whether, and to what extent, a bankruptcy judge has discretion to deny a creditor's effort to pull non-core claims out of bankruptcy and send them to arbitration. Instead, the three judges took three different views on this question—leaving all stakeholders in bankruptcy proceedings within this Circuit in a state of even greater uncertainty than before.

That outcome warrants *en banc* review. The panel's remarkably splintered set of opinions in this case creates a gaping jurisprudential vacuum. As all the judges seemed to agree, the "underlying principles that are applicable here are not in dispute." Op. 14. Yet, they could reach no consensus on how those principles apply. In the dissenting portion of his opinion, Judge Niemeyer wrote that a rule requiring a judge to "split[]" a debtor's "closely related" non-core claim from the rest of a bankruptcy proceeding and send it "to a questionable and perhaps illusory arbitration proceeding would inherently conflict with the purposes of the

1

Bankruptcy Code." Op. 24. Judge Gregory dismissed every one of Judge Niemeyer's proffered reasons why sending a (concededly) related non-core claim to a questionable arbitral forum would conflict with the central purposes of bankruptcy. Judge Davis, in contrast, bypassed the issue entirely, opting instead to consider only whether a non-core claim could, in isolation, remain in bankruptcy. Given the panel's patent disagreement, how, one must wonder, will anyone else— bench or bar—make heads or tails of it? There is no way to harmonize the three opinions, and thus no controlling framework for deciding what to do about non-core claims.

Practical consequences aside, the panel opinions also lay bare a serious doctrinal dispute. Each judge cited this Court's seminal case concerning the conflict between the Bankruptcy Code and the Federal Arbitration Act, *In re White Mountain Mining Co.*, 403 F.3d 164 (4th Cir. 2005), in support of his preferred conclusion. But the panel's divergent views of *White Mountain* cannot all be right, and together they turn the case into nothing more than a glorified Rorschach Test: Litigants on opposite sides will be able to see in it whatever result they are inclined to see.

The confusion sparked by the panel's disagreement is nowhere close to trivial. At the end of 2014, there were nearly 50,000 adversary proceedings pending in bankruptcy courts across the country. *See* Administrative Office of the

United States Courts, 2014 Annual Report, Table F-8, *available at*

http://www.uscourts.gov/Statistics/JudicialBusiness/2014/statistical-tables-us-

bankrupt-courts.aspx ("AO Report"). In the Eastern District of Virginia alone there

were over 13,000 cases involving similar non-core claims between 2009 and 2013.

Br. of Amicus Am. Bar Ass'n, at 21, *EBIA v. Arkison*, 134 S. Ct. 2165 (2014). The

one "creditor" in this case, a payday lender named CashCall, has itself filed

hundreds of similar claims in just one district within this Circuit. And those

numbers are only on the rise. The Consumer Financial Protection Bureau's study

on arbitration reveals that, as of 2011, "around 12 million individuals use payday

loans every year." Consumer Fin. Protection Bureau, Arbitration Study, App. A, 64

n.152 (2015), *available at* http://www.consumerfinance.gov/f/201503_cfpb_

arbitration-study-report-to-congress-2015.pdf.

The uncertainty engendered by these split opinions is intolerable. It will

breed additional litigation over a host of satellite issues—with each side relying on

their preferred opinion in this case—and it will rob bankruptcy judges and district

courts of the discretion they need to do their job to efficiently resolve the main

issues involved in bankruptcy proceedings. Left to stand, the multiple opinions

leave a "black hole of confusion and uncertainty" that threatens to engulf

bankruptcy proceedings whole. *United States v. Vann*, 660 F.3d 771, 787 (4th Cir.

2011) (Agee, J., concurring). It is more than a little ironic that, while both statutes

at play here, the Bankruptcy Code and the Federal Arbitration Act, were designed
to create certainty and ensure the efficient processing of disputes, the divided
opinions in this case accomplish just the opposite. The petition for rehearing
should be granted.

## STATEMENT

**1. The Bankruptcy Proceedings.** At the end of her financial rope, Oteria
Moses "borrowed $1000 from Western Sky Financial, LLC, signing a consumer
loan agreement in which she promised to repay Western Sky $1,500 and 149%
interest, for an [annual] effective interest rate of 233.10%." Op. 5. The loan "was
clearly illegal under North Carolina law," because it imposed an interest rate 15
times higher than the state's allowable rate. Op. 5.Western Sky later transferred the
loan to CashCall, and after Ms. Moses filed a voluntary Chapter 13 bankruptcy
proceeding, CashCall—true to its name—came calling. It filed a proof of claim in
Ms. Moses's bankruptcy proceeding asking the bankruptcy court to award it almost
$2000 dollars out of Ms. Moses's estate.

In response, Ms. Moses filed an adversary proceeding challenging
CashCall's proof of claim. In her complaint, Ms. Moses objected to CashCall's
proof of claim under 11 U.S.C. § 502(a). She further sought a declaratory judgment
that the alleged debt was void under the North Carolina Consumer Finance Act,
N.C. Gen. Stat. §§ 53-164 to -191, and damages based on CashCall's attempt to

4

collect on an illegal debt, an act that qualified as a prohibited act by a debt collector under N.C. Gen. Stat. §§ 75-50 to -56. JA 38. The second claim for damages would rise or fall on the success of the allegation that the underlying loan was illegal.

When Ms. Moses challenged CashCall's effort to lodge its claim against the estate, CashCall did two things to avoid having its claim resolved by a bankruptcy court. *First*, it tried to withdraw its proof of claim from the bankruptcy court arguing that it "no longer wishe[d] to pursue its Proof of Claim." *See* JA 55-58. *Second*—nine minutes after filing its motion to withdraw its claim—CashCall filed a motion to compel arbitration of the entire adversary proceeding.

**2. The Bankruptcy Court's Decision.** The bankruptcy court rejected both of CashCall's efforts to run from bankruptcy. First, the bankruptcy court denied CashCall's effort to withdraw its claim. The bankruptcy court explained that, to allow CashCall to withdraw its claim now, after Ms. Moses "brought an adversary proceeding objecting to the claim," would prejudice Ms. Moses by "necessarily delay[ing] any potential recovery to which [Ms. Moses] would be entitled." JA 92.

Next, the bankruptcy court refused to permit CashCall to break up the claims against the estate. Applying *White Mountain*, the bankruptcy court held that sending either claim to arbitration would inherently conflict with the core objectives of the Bankruptcy Code. The first claim was clearly central to the

5

debtor's reorganization process because it directly challenged a creditor's claim on her estate. JA 86. As for the second, although the bankruptcy court found that it was, as a constitutional matter, a non-core claim, it nevertheless was "necessarily intertwined in the claims allowance process" because "if successful, the bankruptcy estate will recover any non-exempt funds." JA 86, 87.

**3. The District Court's Decision.** CashCall appealed to the district court, which affirmed the bankruptcy court's exercise of discretion to deny the motion to compel arbitration. The district court rejected CashCall's argument that, because one of Ms. Moses's claims in the adversary proceeding was a non-core claim, the whole proceeding should be referred to arbitration. The district court agreed that Ms. Moses's second claim was "inextricably intertwined" with her first claim that CashCall's loan was void. JA 127. In reaching this conclusion, the district court explained that the second claim "ar[ose] out of [the] first claim," and so a "finding by the bankruptcy court that the loan was not void" would "cause Moses' second claim to necessarily fail." JA 127. For this reason, the district court agreed that sending any of the claims to arbitration "would frustrate, rather than facilitate, the efficiency favored by arbitration and could potentially lead to inconsistent results" while keeping the claims in bankruptcy would "greatly serve[]" the objectives of the Bankruptcy Code by "allowing the bankruptcy court to consider both claims together." JA 128.

6

**4. The Panel's (Four) Opinions.** A splintered panel of this Court affirmed in part, reversed in part, and remanded with instructions. The panel first issued a *per curiam* opinion explaining the holdings in the case and describing the various separate opinions. A majority of the panel, "for the reasons given by Judge Niemeyer in Parts I, II.A, and III of his opinion," held that "the district court did not err in affirming the bankruptcy court's exercise of discretion to retain in bankruptcy Moses' first claim for declaratory relief." Op. 3. A different majority of the Court also held "that the district court erred in retaining in bankruptcy Moses' claim for damages . . . and denying CashCall's motion to compel arbitration of that claim." Op. 3. But, the two judges who agreed with that result did not agree on the reasons, so they each wrote "separate opinions concurring in that judgment." Op. 4. Judge Niemeyer "wrote a separate opinion on that issue, dissenting." Op. 4.

**A. The Core Claim.** Judge Niemeyer, joined by Judge Gregory, held that sending a core claim to arbitration "would pose an inherent conflict with the Bankruptcy Code and that the district court did not err in affirming the bankruptcy court's exercise of discretion in retaining it in bankruptcy." Op. 20. The majority explained that, "[w]hile arbitration agreements are to be rigorously enforced, bankruptcy too represents a fundamental public policy." Op. 20. The Bankruptcy Code was designed to "provide debtors and creditors with the 'prompt and effectual administration and settlement of the [debtor's] estate,'" and "centralize

disputes over the debtor's assets and obligations in one forum, thus protecting both creditors and debtors from piecemeal litigation and conflicting judgments." Op. 20. The majority found it "apparent" that the resolution of Ms. Moses's core claim implicated the fundamental purposes of the Bankruptcy Code. Op. 21. Citing *White Mountain*, the majority held that "ordering arbitration of a dispute that directly pertains to Moses' plan for reorganization would 'substantially interfere with [her] efforts to reorganize,'" and therefore affirmed the lower court's decision to deny the motion to compel arbitration. Op. 22.

Judge Davis dissented. He would have reviewed, and reversed, the bankruptcy court's (unappealed and unappealable) order "disallowing withdrawal of the proof of claim." Op. 65. Then, with CashCall's proof of claim no longer in the case, he would have concluded "that Moses's core claim has been rendered moot," and would not have "decide[d] whether the bankruptcy court erred in refusing to compel arbitration on Moses's core claim." Op. 71.

**B. The Non-Core Claim.** For the non-core claim, the panel split three ways. Judge Niemeyer, writing only for himself (and dissenting from the holding), explained that "splitting Moses' closely related claims and sending Moses' non-core claim to a questionable and perhaps illusory arbitration proceeding would inherently conflict with the purposes of the Bankruptcy Code." Op. 24. In reaching this conclusion, Judge Niemeyer offered several reasons why sending the non-core

8

claim to the questionable forum designated in CashCall's arbitration agreement would disserve bankruptcy. *First*, if Ms. Moses were to recover damages, that recovery "should accrue to the other unsecured creditors." Op. 25 Yet, the "many questions" over the legitimacy of CashCall's particular arbitration setup "raise doubts that arbitration would conclude in time for Moses' creditors to . . . share in any recovery." Op. 25.

*Second*, Judge Niemeyer explained that Ms. Moses's "non-core claim is directly tied to her core claim." Op. 28. Ms. Moses's non-core claim alleged that CashCall's efforts to collect the debt violated state law "*because the underlying loan obligation was illegal*"—the "very issue presented by her core claim." Op. 28 (emphasis in original). Given this overlap, separating the two claims "will force an arbitrator and the bankruptcy judge *separately* to decide the validity of the underlying debt." Op. 28 (emphasis in original). Citing *White Mountain*, Judge Niemeyer discussed why "[t]hat scenario inherently conflicts with the purposes of the Bankruptcy Code." Op. 28. It would generate considerable inefficiency by "having two tribunals adjudicate the identical issue," Op. 28; it would invite the possibility that an arbitrator's judgment could "inappropriately bind the bankruptcy court" on a "constitutionally core issue," Op. 30; and it would impose "additional litigation costs" that "will harm Moses' creditors by reducing the amount of income that Moses has available to pay her debts," Op. 31. "At bottom," Judge

9

Niemeyer could not "see how the district court abused its discretion by keeping Moses' non-core claim together with the core claim for adjudication in the bankruptcy court." Op. 33-34.

Judge Gregory disagreed. He recognized that "Moses' core and non-core actions share one common question," but he did not think that splitting the claims would "pose an inherent conflict." Op. 53. "[A]part from" the shared common question, Judge Gregory saw "little overlap" between the core and non-core claims such that they could "be said to be inextricably intertwined." Op. 54. Like Judge Niemeyer, Judge Gregory also discussed *White Mountain*, but he drew an opposite conclusion about that case's impact—in his view, all of the concerns identified in *White Mountain* as relevant to the "inherent conflict" inquiry were absent here. He reasoned that, "[a]s for any potential inefficiency and delay," the concerns would be limited. Op. 53. He also saw the "danger" of "potentially bind[ing] a bankruptcy judge through collateral estoppel" as "speculative at best." Op. 55. As for the possibility that the "estate could be enriched or depleted as a result of litigation," any damages received would, in his view, "certainly not frustrate creditors who could share spoils," and any depletion was too "generic" a consideration to "justify a denial of arbitration." Op. 57.

Judge Davis took a different approach. Because he believed the core claim should have been dismissed as moot, he considered only the "narrow question" of

10

whether, standing alone, the non-core claim "must be referred to arbitration." Op. 71. "Applying *White Mountain*," Judge Davis concluded that the "only way in which the non-core claim is even related to the bankruptcy proceedings is that, if it is successful, the bankruptcy estate will recover additional funds." Op. 74. Judge Davis could not see "how an enlargement of the assets in the bankruptcy estate would frustrate creditor distribution or otherwise interfere with the bankruptcy proceedings." Thus, he "agree[d] with CashCall that Moses must arbitrate her non-core claim." Op. 74.

**_EN BANC_ REVIEW IS WARRANTED TO ESTABLISH THE STANDARDS GOVERNING WHETHER, AND TO WHAT EXTENT, A LOWER COURT HAS DISCRETION TO KEEP NON-CORE CLAIMS IN BANKRUPTCY.**

Given the panel's three-way split over the correct approach lower courts must follow when deciding what to do with non-core claims, this case is appropriate for full-court review. *En banc* review is reserved primarily so that the "active circuit judges shall determine the major doctrinal trends of the future for their court," and is justified "to bring to bear the full court's consideration of a major doctrinal problem having serious precedential implication for circuit, and possibly national, law." *Arnold v. Eastern Air Lines, Inc.*, 712 F.2d 899, 914, 915 (4th Cir. 1983) (Phillips, J., dissenting) (internal quotations and emphasis omitted). That perfectly describes the issue that splintered the panel in this case. Left to stand, the panel's three separate opinions leave lower courts and practitioners with

11

no clear guidance over—and in a greater state of uncertainty about—the appropriate standard that governs a creditor's effort to withdraw a non-core claim from bankruptcy.

The central disagreement in this case hinges on how one determines whether sending a claim to arbitration would "inherently conflict" with the Bankruptcy Code. All the judges seemed to agree that the key "principles" were not in dispute. Op. 14. What divided the panel was how those principles apply to non-core claims. Drawing from *White Mountain*, Judge Niemeyer identified several specific factors that, where present, could trigger an inherent conflict between the Bankruptcy Code and the FAA. These included (1) the "strength of the [non-core claim's] relationship with the core claim," Op. 25, (2) the likelihood that the unavailability of the arbitral forum could delay or defeat recovery of money for the estate, Op. 25, (3) the inefficiency that would flow from bifurcating the claims and forcing "two tribunals [to] adjudicate the identical issue," Op. 28, (4) the possibility that an arbitrator's judgment would "inappropriately bind the bankruptcy court" on a "constitutionally core issue," Op. 30, and (5) the "additional litigation costs inherent in being forced to litigate claims before two separate tribunals," Op. 31. All of these concerns, in Judge Niemeyer's view, were clearly implicated in this case—so the lower courts' exercise of discretion to keep the claim in bankruptcy was on *terra firma*.

12

Judge Gregory and Judge Davis disagreed, but for different reasons. Judge Gregory believed that even though the core and non-core claims shared "one common question," splitting the claims would not "conflict with the purposes of the Bankruptcy Code," and he dismissed as either "speculative" or "generic" every one of the factors identified by Judge Niemeyer. Op. 53, 55, 57. For instance, "any potential for inefficiency and delay" was trivial, since a district court would have to review either judgment (a bankruptcy court's or an arbitrator's) before entering final judgment. Op. 53-54. And the potential "danger" in binding a bankruptcy judge was "speculative at best" and could be addressed by "stay[ing] arbitration proceedings for some brief period." Op. 55. Judge Davis, for his part, considered only whether the non-core claim, standing alone, could stay in bankruptcy (he believed the core claim was moot). In his view, the "only way" the non-core claim could affect the bankruptcy proceeding was to "enlarge[]" the estate—a result that could not "interfere with the bankruptcy proceedings." Op. 74.

This constellation of different conclusions will leave significant confusion in its wake. Whose opinion should lower courts follow? What factors are appropriate when considering whether a non-core claim should stay in bankruptcy or be sent to arbitration? How closely related must a non-core claim be with a core claim? How can one establish a likelihood of collateral estoppel, or the cost of litigating an issue twice in two different places? Judge Niemeyer concluded that all the relevant

13

factors had been met here; Judge Gregory concluded that none were; Judge Davis did not say. "What comes out of [these three decisions] is—to be frank—who knows what." *Williams v. Illinois*, 132 S. Ct. 2221, 2277 (2012) (Kagan, J., dissenting).

One thing, though, is for sure: The uncertainty sparked by the divergent panel opinions will breed all sorts of unwanted satellite litigation. Consider just a few of the topics that are now up for litigation: (1) the availability of a proper alternative forum; (2) the issues underlying the non-core claim (the extent to which the core and non-core claims are sufficiently related, the types of evidence and proof that would be necessary in proving the claim); (3) whether there would be "detailed and time-consuming findings regarding [the creditor's] conduct in trying to collect on the loan," Op. 54; (4) whether the non-core claim is "inconsequential"; and (5) the collateral estoppel effects of an arbitrator's decision on the legality of a loan. Each motion to compel will balloon into its own separate mini-trial, further consuming the scarce resources and time of already over-burdened bankruptcy judges and trustees. That result is surely as unwanted as it is unfortunate.

Making matters worse, the issues here are commonplace, and the uncertainty surrounding a creditor's effort to siphon off key disputes into arbitration would fundamentally threaten the ability of bankruptcy courts to do their job. At the end

14

of 2014, there were nearly 50,000 adversary proceedings pending in bankruptcy courts, *see* AO Report, Table F-8, and some districts within this Circuit see thousands of similar non-core claims each year, Br. of Amicus Am. Bar Ass'n, at 21. Just CashCall itself has filed proofs of claim in more than a hundred individual Chapter 13 bankruptcy proceedings in just *one* district within the Circuit. JA 66. And the problem is particularly pernicious in individual consumer bankruptcy proceedings, where the estate is small, meaning every claim or dispute has a potentially large impact, and the costs of bifurcation and delay could threaten to overwhelm the estate—a problem for both creditors and debtors alike.

The upshot: The panel opinions in this case trade away certainty and efficiency for confusion and ambiguity in a statutory regime that seeks, almost above all else, to promote the efficient and streamlined resolution of disputes. The panel's inability to find common ground on an issue of exceptional importance to all stakeholders in a bankruptcy proceeding throws an enormous wrench into a process that is designed to be clear and straightforward. That result should not be tolerated.

## CONCLUSION

The petition for rehearing should be granted.

15

Respectfully submitted,

Adrian M. Lapas                     s/ Matthew W.H. Wessler
LAPAS LAW OFFICES, PLLC         Matthew W.H. Wessler
642 N. Spence Avenue            Leah M. Nicholls
Goldsboro, NC 27534             PUBLIC JUSTICE, P.C.
(919) 583-5400                  1825 K Street NW, Suite 200
                                Washington, DC 20006
                                (202) 797-8600


*Counsel for the Petitioner*

March 30, 2015

## CERTIFICATE OF SERVICE

I certify that on March 30, 2015 the foregoing document was served on all

parties or their counsel of record through the CM/ECF system.

   s/ Leah M. Nicholls     
Leah M. Nicholls

March 30, 2015